IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal No. 1:17-cr-133-01 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANT'S SENTENCING** |
| | ) | **MEMORANDUM** |
| Jeffrey Hester-Jackson, | ) | |
| | ) | |
| Defendant. | ) | |

## PERSONAL BACKGROUND

**Family.**   Defendant Jeffrey Hester-Jackson ("Jeffrey") was born in Detroit, Michigan, in 1994.   (PSR ¶46.)   He is 24 years old.   He has resided in Detroit his entire life.   (Id.)

Jeffrey's father – Jeffrey Jackson - was shot and killed by a "friend" when Jeffrey was one year old.   (Id.)   His mother – Anitra Hester – went to prison when Jeffrey was three years old.   (Id.)   Jeffrey and his sister Alize Watson (age 23 years) resided with their paternal grandmother, Paula Drew, and paternal uncle, Sid Jackson.   (Id.)   Four years later, Jeffrey's mother was released from prison.   (Id.)   Jeffrey and his sister moved back in with their mother, but Jeffrey was doing poorly in school, so he and his sister moved back in with Paula Drew and Sid Jackson.   (Id.)   Jeffrey was residing with Paula Drew up until this instant offense.   (Id.)   Upon release from incarceration, he would likely move back in with her.

Jeffrey began dating Dejandre Johason at the age of 15 or 16.   (PSR ¶47.) They had a child together, Morgan Jackson, age 2.   (Id.)   Jeffrey is no longer dating

1

Dejandre and is currently single.   (Id.)

Throughout his young adult life and this case, Jeffrey has had strong support from Paula Drew (his paternal grandmother) and Anitra Hester (his mother).   While this will help him once he is released, he needs to take charge of his own life through additional education and a full time, career-oriented job.   It is obvious he needs to grow up and be his own man.

**Education.**   Jeffrey completed the 11th grade of high school in Detroit.   (PSR ¶55.)   He dropped out after his uncle passed away.   (Id.)   He has attended no additional schooling since then, but would like to obtain his GED.   (Id.)

**Employment.**   Jeffrey's last employment was at age 14, working at a car wash and his uncle's lawn service company.   (PSR ¶56.)   He has been supported by his family his entire young adult life.   (Id.)   His criminal activity in selling drugs was motivated by financial gain.   (Id.)   Clearly he needs employment to give his life some structure and self-worth.   "Idle hands are the devil's playground."

**Drug Addiction.**   In approximately 2010, Jeffrey began using marijuana at age 15 with his friends.   (PSR ¶57.)   He continued his marijuana usage until he was 17 years old.   (Id.)   He began consuming alcohol at age 18, which he claims was "occasional" use.   (Id.)   A friend introduced him to Percocet pills at age 20, with is use being occasional.   (Id. ¶58.)   Jeffrey was accidentally shot at age 21, after which he was prescribed Percocet.   (Id.)   He began taking more pills than prescribed and became addicted, eventually using 2-3 pills per day until 2017.   (Id.)   At the age of 21, he and a friend began consuming cough syrup mixed with a carbonated drink.   (Id.)

2

This continued until 2017.   (Id.)   Jeffrey has never attended treatment but would like to.   (PSR ¶59.)

**Criminal Background.**   Jeffrey became involved in the criminal world at a young age.   His Pre-Sentence Report (PSR) reflects two different sets of juvenile charges at age 13, then additional charges at age 17.   (PSR ¶s22-24.)

As an adult, Jeffrey's record is relatively sparse.   At age 21, he pled guilty to Fleeing From an Officer.   (PSR ¶25.)   He received a probationary sentence.   He also had several DUS charges that resulted in fines.   (PSR ¶s26-28.)

## CHARGES

On June 7, 2017, a six-count Indictment was filed in this case charging Defendant with oxycodone offenses.   (Doc. 2.)   Eight other Defendants were named as co-conspirators.   Defendant was charged in Counts one, two, and four.   No quantities were listed in those counts, except Count 4 alleged Defendant possessed approximately 1,650 oxycodone pills with intent to deliver.

A warrant was issued, and the Defendant was arrested on March 9, 2018, in the Eastern District of Michigan.   (PSR ¶1.)   A Detention Hearing was held on March 13, 2018, resulting in an Order that Defendant be detained pending trial.   (Id.)

**Defendant's time served from March 9, 2018, to the date of sentencing on July 11, 2019, is 1 year, 124 days.**

## PLEA AGREEMENT

On April 4, 2019, a Plea Agreement was filed.   (Doc. 307.)   The parties agreed Defendant would plead guilty to Count 1, with the remaining Counts to be dismissed.

(PA ¶s6, 18(d).   They also agreed to a Base Offense Level (BOL) of 24.   (Id. ¶13.)

The parties agreed the United State would recommend a 2 level decrease for Acceptance of Responsibility and a 1 point reduction for Timely Notification.   (Id. ¶14.) They also reached an agreement that an additional 3 points **might** be added under USSG §3B1.1(b) for manager/supervisor role, with Defendant reserving the right to challenge application of the aggravating role enhancement contained in USSG §3B1.1(b).   (Id. ¶13.)   Defendant has challenged the manager/supervisor role via an objection to the PSR, which will be addressed below.

Under the Plea Agreement, the United States agreed to recommend a sentence of imprisonment within the Guidelines sentencing range as calculated by the Court at sentencing, **but not to exceed 68 months**.   (PA ¶18(a).)   The U.S. will also recommend Defendant serve a 3 year term of supervised probation and pay the special assessment of $100.   (PA ¶s18(b)&(c).)

Defendant may recommend any sentence.   (PA ¶19.)

<u>PRE-SENTENCE REPORT</u>

The Presentence Investigation Report (Doc. 390) contains the following provisions:

1.  The base offense level is 24.   (PSR ¶10.)

2.  Three point increase for manager/supervisor.   (PSR ¶12.)

3.  Two point decrease for acceptance of responsibility.   (PSR ¶17.)

4.  One point decrease for timely notification.   (PSR ¶18.)

5.  Total offense level of 24.   (PSR ¶19.)

4

6. Criminal history score of 2, resulting in a Criminal History Category of II.   (PSR ¶30.)

7. Based on a Total Offense Level of 24 and a Criminal History Category of II, the guidelines imprisonment range is 57 – 71 months.   (PSR ¶80.)

8. Jeffrey's Post-Conviction Risk Assessment (PCRA) is a Level 3, meaning a 29% chance of re-arrest and a 54% chance of revocation.   (PSR ¶52.)   His major risk concerns include criminal history, education and employment, extensive drug addiction that resulted in participation in the instant offense, social networks, and cognitions.   (PSR ¶s53-62.)

9. On the plus side, he has a stable, drug-free home to return to with his grandmother or mother.   (PSR ¶64.)

## OBJECTIONS TO PSR

Defendant has two objections to the PSR.

**1.     Paragraph 12, Victim Related Adjustment.**

The PSR assesses 3 points to the Offense Level for being a manager or supervisor under USSG §3B1.1(b) on the basis that "[D]efendant obtained the prescription drugs from his connections in Detroit, Michigan.   He then distributed them or had others distribute these pills to individuals in North Dakota."   (PSR ¶12.)

USSG §3B1.1 provides for 2, 3, and 4 I level increases to the offense level, depending on the defendant's aggravating role in the offense, as follows:

     (a)     If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b)     If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c)     If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

Pursuant to USSG §3B1.1, Application Note 4, the factors a court should consider in determining the application of this role adjustment include:

1.  The exercise of decision making authority.

2.  The nature of participation in the commission of the offense.

3.  The recruitment of accomplices.

4.  The claimed right to a larger share of the fruits of the crime.

5.  The degree of participation in planning or organizing the offense.

6.  The nature and scope of the illegal activity.

7.  The degree of control and authority exercised over others.

The Eighth Circuit has "defined the terms 'manager' and 'supervisor' quite liberally  . . .   The key factors in determining management or supervisory authority are control over participants and organization of the criminal activity."   U.S. v. Mannings, 850 F3d 404, 409 (8th Cir. 2017).   Some of the 8th Circuit cases that have addressed what constitutes manager or supervisor include:

1.  U.S. v. Voegtlin, 437 F3d 741 (8th Cir. 2006).   Affirmed the district court's application of the 2-level adjustment on grounds that the defendant acted as a supervisor or manager by instructing others to obtain precursors used to produce methamphetamine.

2.  U.S. v. Rodriguez, 741 F3d 908, 912 (8th Cir. 2014).   Upholding enhancement

where the defendant directed his coconspirator to transport drugs and drug proceeds, and concluding that the fact that the defendant reported to others in the conspiracy does not negate his role in managing and supervising the activities of a coconspirator.

3. U.S. v. Atkins, 881 F3d 621, 628 (8th Cir. 2018).   Affirmed the 2 point adjustment in a wire fraud case because the defendant decided how and when the fraudulent tickets were created, what loads would be duplicated and received, and how much remuneration he would receive.

The government bears the burden of proving by a preponderance of the evidence that the aggravating role enhancement is warranted.   U.S. v. Lora-Andres, 844 F3d 781, 785 (8th Cir. 2016).

In this case, the government has failed to meet its burden of proving that Defendant was a manager or supervisor.   In support of its position, the United States has submitted summaries of interviews and cell phone text messages prepared by law enforcement agents.   This is all inadmissible hearsay evidence that does not afford Defendant the right of cross examination.   Until and unless Defendant is able to cross examine those witnesses and see the actual evidence such as text messages, the sentencing court should not even consider this issue.

Assuming the United States puts on admissible evidence to try and prove its case, two questions have to be asked.   First, did the criminal activity involve five or more participants?   Second, if it did, was Defendant a manager or supervisor?

Regarding the first question, Defendant pled guilty to conspiring with eight other

named Defendants to distribute oxycodone charge.   There seems little doubt that "the criminal activity involved five or more participants."

Second, was Defendant a manager or supervisor?   The United States has focused its argument on Defendant being a manager or supervisor of several individuals.   As noted, until Defendant can cross examine those individuals the United States intends to rely on, the United States has not met its burden of proof on this issue.

### 2.   Paragraphs 24 & 29-30, 1 Criminal History Point for Juvenile Offense.

Defendant's second objection to the PSR is contained in Paragraph 24, in which 1 criminal history point is added under USSG §4A1.1(c) for the juvenile offenses committed in 2012 for (a) discharge firearm in or at a building and (b) weapons felony firearm.   The PSR notes:

> [T]he Defendant was placed on a Home Youth Training Act 771 (HYTA) program at the time of sentencing.   HYTA convictions are similar to convictions taken under advisement.   Generally, a defendant is sentenced to a term of probation and if he completes the term of probation, the Court seals the conviction. . . .   All HYTA convictions [since January 1994] . . . require the Defendant to enter a plea of guilty prior to sentencing.   Pursuant to USSG 4A1.2(f), a diversionary disposition resulting from a finding or admission of guilt, or a plea of nolo contender, in a judicial proceeding, is counted as a sentence under USSG 4A1.1(c), even if a conviction is not formally entered, except that diversion from juvenile court is not counted.

It is Defendant's argument that USSG 4A1.2(f) does not apply in this case; rather, USSG 4A1.2(d) applies, which provides:

> (d)    Offenses Committed Prior to Age Eighteen.
>
> (1)    If the defendant was **convicted as an adult** and received a sentence of imprisonment exceeding one year and one month, add 2 points under §4A1.1(a) for each such sentence.   (Emhasis added.)

8

(2)    In any other case,

       (A)    add 2 points under §4A1.1(b) for each adult or juvenile sentence to confinement of at least sixty days if the defendant was released from such confinement within five years of his commencement of the instant offense;

       (B)    add 1 point under §4A1.1(c) for each adult or juvenile sentence imposed within five years of the defendant's commencement of the instant offense not covered in (A).

The Application Notes ¶7 indicate that Section 4A1.2(d) covers offenses committed prior to age eighteen.   The final sentence of ¶7 states, "[T]his provision applies to **all offenses** committed prior to age eighteen."   (Emphasis added.)

The offense in 2012 occurred when Defendant was under age 18, so 4A1.2(d) applies, not 4A1.2(f).   Here there was no conviction because Defendant successfully completed his HYTA program.   Therefore under USSG 4A1.2(d), no points would be added because there was no conviction as an adult required under that section.

If the above offense committed as a juvenile receives no points, then under Paragraphs 29 and 30, Defendant would have a criminal history score of 1, which establishes a criminal history category of II.

### Result if above objections are valid – Paragraph 80.

If the above objections are deemed valid by the Court, then Paragraph 80 of the PSR should reflect a total offense level of 21 and a criminal history category of I, resulting in a **guidelines imprisonment range of 37-46 months**.

### 18 USC § 3553 (a) FACTORS

Under 18 USC § 3553 (a), "[T]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of

this subsection.   The Court, in determining the particular sentence to be imposed, shall consider [the following factors]:"

1. **The nature and circumstances of the offense and the history and characteristics of the Defendant.**

   The history of Defendant reflects a loss of his father at age 1 and his mother going to prison for four years when he was 3.   He was raised by other family members, mainly his grandmother.   His education was cut short when his uncle died and he (Defendant) dropped out of school.   He was somewhat involved with drugs at a young age.   His employment was limited.   He was involved in some criminal activity starting at the very young age of 13, although his criminal record as an adult is relatively minimal.   All of these factors resulted in an environment with little or no structure, with Defendant finding himself in his early 20s with a future that looked bleak.

   At that point in his life, Defendant made a very poor decision by getting involved in the sale of drugs in order to raise money to support himself.   Based on the character letters submitted on his behalf, he is fully capable of now turning his life around and doing something fulfilling with his life.   Furthermore, those letters, as well as some of those individuals coming all the way from Detroit to attend his sentencing, show he has a strong support system once he is released.   Certainly Defendant has learned that, in the future, hard work and being law abiding will ultimately result in a better life style than selling drugs.   His family can provide the help he needs to keep on track in the future.

   The offense is serious and Defendant needs to be punished.   However, in light of his upbringing and background, Defendant believes a sentence in the guidelines range of 37-46 months is appropriate.

2. **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the Defendant; and to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective way.**

As noted above, there is no question that punishment is warranted in this case. A sentence of 37-46 months is appropriate for Defendant's behavior in bringing drugs from Detroit to North Dakota for purposes of distribution.    A sentence of three years accomplishes all of the purposes of the criminal law by deterring Defendant from such conduct in the future, punishing him for what he did, giving him sufficient time to reflect on how his criminal activity harmed others, and earning his respect for the law.

3. **The kinds of sentences available.**

A guidelines sentence, a transition center, or release are the only options here.

4. **The kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of Defendant as set forth in the guidelines.**

If the Defendant's objections are held to be valid, the guidelines sentencing range is 37-46 months.

5. **Any pertinent policy statement issued by the Sentencing Commission pursuant to § 994(a)(2) of title 28 in effect on the date the Defendant is sentenced.**

Unknown.

6. **The need to avoid unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar conduct.**

The sentences of co-conspirators to date have been as follows:

11

a. Demarco Ritter was sentenced on February 15, 2019, and received time served.   (Doc. 300.)   Unknown regarding his level or how much time he had already served.

b. Storm Grey Cloud was sentenced on April 8, 2019.   (Doc. 318.)   She received time served.   Unknown regarding her level or how much time she had already served.

c. Jazmin Velma Lambert was sentenced on April 22, 2019, and received time served.   (Doc. 339.)   She had served 129 days.   She pled guilty to a criminal offense level of 18, as compared to Defendant's level of either 21 or 24.   She received a 2 point reduction for safety valve.

d. Daniel Wells was sentenced on April 22, 2019, and received a year and a day.   (Doc. 341.)   He was a level 20 and had served approximately 4 months already.

e. Lereco Koger was sentenced on Mary 13, 2019, to 48 months, with credit for time served.   (Doc. 357.)   The guidelines amount was 41 to 51 months.   AUSA Rick Volk argued for 48 months.

In light of the above sentences, Defendant's request for a guidelines sentence of 37-46 months seems compatible with what other co-conspirators received for sentences.

7. **The need to provide restitution to any victims of the offense.**

Not applicable.

## SENTENCE REQUESTED

**The Defendant is requesting a guidelines sentence of 37-46 months, with credit for time served from March 9, 2018, to the date of sentencing on July 11, 2019, being 1 year, 124 days.**

.

Dated this 8th day of July, 2019.

Mark A. Meyer
Attorney for Defendant
ND Atty. Reg. No. 04966
205 North 7th Street
P.O. Box 216
Wahpeton, ND 58074-0216
(701) 642-1660
(701) 642-2061 (fax)
markameyer@702com.net

## CERTIFICATE OF SERVICE

Mark A. Meyer, Attorney for Defendant Jeffrey Hester-Jackson, hereby certifies that on July 8, 2019, the following document:

1.      Defendant's Sentencing Memorandum

was served upon:

Rick L. Volk
Assistant U.S. Attorney
rick.volk@usdoj.gov

by filing electronically.

Mark A. Meyer
Attorney for Defendant

13